In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-21-00334-CR

HERBERT CHARLES CLARK, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 19-30974**

## MEMORANDUM OPINION

A grand jury indicted Appellant Herbert Charles Clark for the murder of Sonny Crowell,[1] and the indictment included two enhancement paragraphs for prior felony convictions. Clark pleaded not guilty to the offense, but the jury found him guilty. The jury found the alleged enhancements true, assessed punishment at ninety-

---

[1] We refer to the victim, his family, and civilian witnesses by pseudonyms to conceal their identities. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

1

nine years of confinement, and assessed a fine of $10,000. In three issues, Clark challenges the sufficiency of the evidence to support his conviction and the admission of certain evidence. We affirm.

## Evidence at Trial

### Testimony of Officer Chad Morrison

Officer Chad Morrison, with the Port Arthur Police Department, testified that he was called to a shooting in the parking lot of a nightclub in Port Arthur at about 2:30 a.m. in December 2018. According to Morrison, when Morrison arrived, he found about fifty people surrounding a person lying face down in the street, and the victim appeared unresponsive and deceased. Morrison testified that the crowd was not cooperative, and no one volunteered any information about what had happened, but one person identified the victim by name. Morrison recognized the deceased as someone he had arrested on a drug charge a few months earlier. Morrison also observed seven shell casings around the victim and two gunshot wounds to the victim's back. Morrison testified that EMS arrived within "a couple minutes[]" and transported the victim to the hospital. Morrison agreed that he was wearing a body cam that night, and the recording from his body cam was admitted as State's Exhibit 1 and published to the jury.

Testimony of Detective Thomas Barboza

Thomas Barboza, a detective with the Port Arthur Police Department, testified that he was assigned to investigate homicides on December 2, 2018. Barboza testified that around 3:00 a.m. he responded to a call at a nightclub in Port Arthur where he learned that Sonny Crowell was the victim and officers were securing the scene and collecting evidence. Barboza testified that although a lot of people were outside the club, no one came forward to say what they saw or cooperate with police. According to Barboza, in about eighty percent of the cases he investigates, "people don't want to get involved and don't want to come forward."

At some point in his investigation, Barboza obtained enough information to identify Herbert Clark as a suspect, and Barboza stated that he later located Clark "in Dallas, Texas, at the jails there." The defense objected that this testimony concerned an extraneous offense that was subject to a motion in limine. The trial court overruled the objection and instructed that the prosecutor must not ask any questions about why Clark had been arrested in Dallas.

Barboza testified that he had talked to a witness named Ashton, who was not cooperative initially. According to Barboza, a woman named Elynne confirmed to him that she gave Clark a ride to Dallas early in the morning after the shooting happened.

Testimony of Marie Kirkland

Marie Kirkland, a crime scene investigator for the Port Arthur Police Department, testified that she was called to the scene of a shooting at a nightclub early in the morning of December 2, 2018. She testified that she recovered from the scene the marked and photographed evidence, including eight fired 9mm shell casings. Kirkland identified State's Exhibits 2 through 43 as photographs she took at the scene that depict the fired shell casings, and the exhibits were admitted into evidence. Kirkland also testified that she photographed Sonny at the hospital after he had died, and her photographs were admitted into evidence. Kirkland testified that there were multiple bullet holes in Sonny's body, which her photographs depict. Kirkland identified two of the State's exhibits as bullet projectiles that were removed from Sonny's body, which she collected as evidence. According to Kirkland, an unfired bullet was examined by the lab and identified as 9mm, and ballistics analysis was performed on the fired shell casings and projectiles.

Testimony of Brandy Henley

Brandy Henley, a forensic scientist firearms examiner at the Jefferson County Regional Crime Lab, testified that she received some fired shell casings, bullet fragments, and an unfired bullet or round for analysis in this case. Henley identified State's Exhibits 115 through 127 as the evidence she received and resealed after her analysis. She testified that Exhibits 115 through 122 contained fired 9mm Luger

caliber cartridge cases and, in her opinion, they were all fired from the same firearm. Henley testified that Exhibit 124 was an unfired bullet.

Testimony of Dr. Strauch Rivers

Dr. Strauch Rivers testified that she is the chief forensic pathologist for Forensic Medical Management Services for Texas, and she reviewed an autopsy performed by Dr. Ralston on Sonny Crowell. Rivers identified State's Exhibits 55 through 106 as photographs taken during Crowell's autopsy. Dr. Rivers testified that Crowell's body had nine separate gunshot wounds, and one of the wounds had an associated graze. According to Rivers, it was unknown which wound occurred first. Rivers testified that Dr. Ralston had concluded that Crowell's cause of death was multiple gunshot wounds, including two gunshot wounds that went through the lungs and heart that would have been very quickly fatal, and the manner of death was homicide. Rivers also testified that a toxicological analysis revealed PCP present in Crowell's system. Rivers testified that she agreed with Dr. Ralston's opinions.

Testimony of Rachel

Rachel testified that Sonny Crowell was her father and that he was also known as "Ty V." Rachel testified that about one week before her father died, she and other family members went out for a birthday party. At one point during the evening, she was standing with her friend Kaycee across the street from a nightclub in Port Arthur, and a man pulled up to talk with her friend. Rachel identified Clark as the man who

pulled up that night. Rachel testified that Kaycee did not want to talk with Clark, Kaycee told Clark her name was "Rachel," Rachel got angry with Kaycee for using her name, and Clark got angry with Rachel for interfering. Rachel testified that another man approached to see if Kaycee was okay, and that man and Clark got into a "big altercation." According to Rachel, Clark pulled out a gun, got out of his car, and Rachel thought he might shoot someone. Rachel stated that Clark jumped back into his car because it was rolling, and Rachel and her brother saw Clark later that night at a nearby store where Clark "pulled a gun out on [them]." Rachel testified that Clark told her to "call [her] daddy[]" or her uncle because her uncle knew Clark. Rachel also testified that she spoke with her father, who told her to come home.

Testimony of Ashton

Ashton testified that he did not want to be in court or be part of the trial because he did not want to put his children and family in harm's way, and he agreed he was in court against his will and due to a subpoena. Ashton testified that he felt he was in harm's way by testifying and that his family had received threats since the shooting, including that he should not cooperate or go to court.

Ashton agreed he had witnessed a shooting in downtown Port Arthur at a nightclub in the early morning of December 2, 2018. Ashton testified that he saw two men arguing and the big guy, whom Ashton knew as "Ty V," was trying to fight the little guy. Ashton heard a gunshot come from the side of the club across the street

6

where the two men were standing. Ashton heard "eight or nine[]" shots, and Ashton testified that Sonny—the big man—had been shot.

Ashton agreed that he had spoken with Port Arthur detectives in January 2019. Ashton agreed that when he spoke with detectives, he told them he thought the little guy was "Little Herb" based on a photo he had seen on someone else's phone, but he was not "a hundred percent sure[]" and he denied recognizing the defendant. Ashton also agreed he told the detectives that the person who shot the victim got into a silver car. Ashton testified that someone he knew of named Darren Peters was at the nightclub the night of the shooting. Ashton testified that he had his phone with him that night and he recorded the police and the aftermath, but not the shooting.

Testimony of Elynne

Elynne testified that she was currently on deferred adjudication for drug possession, and in 2018 she was living in Port Arthur. In the early morning of December 2, 2018, she was at home and around 2:00 or 3:00 a.m. Herbert Clark came to her apartment and he asked her to drive him to Dallas. She agreed and she drove Clark to "a girl's house[]" in Dallas, and then Elynne drove back home. Elynne identified the defendant in the courtroom as the man that came to her apartment that night. Elynne told the jury she did not regard it as unusual for Clark to show up in the middle of the night, and she had given him a ride to Dallas "[a] couple[]" of times before. Elynne testified that she did not know why Clark wanted to go to Dallas

7

other than to see a girl, and when she got back to Port Arthur, she learned that Clark was a suspect in a shooting. Elynne also stated that the nickname she had used for Clark is "Charlie" and not "Little Herb."

Testimony of Darren Peters

Before Darren Peters testified, his appointed counsel told the court that Peters was "vehemently opposed to taking the stand[]" and that Peters had told his attorney that associates of Clark had threatened Peters. Outside the presence of the jury, Peters then stated on the record "I don't want to talk, and I don't want to testify." Peters also denied that he had been threatened and stated he had nothing to say and wanted nothing to do with the case. On voir dire, Peters stated that he had known Clark most of his life, but he pleaded "the Fifth" in response to all other questions about the case.

After the jury came back into the courtroom, on direct examination Peters testified that he had grown up in Port Arthur, but he was incarcerated at the time of trial for possession of a controlled substance. Peters explained that Sonny Crowell was a childhood friend whom he had known for "multiple years." Peters testified that he did not remember where he was on December 2, 2018, and he did not remember the night Crowell died. Peters remembered that he had talked with law enforcement officers about Crowell's death about two weeks before trial, but he did not remember an investigator writing out his words as a statement. When the

prosecutor showed Peters a written statement signed by Peters, Peters agreed that the investigator had written it and Peters had signed it, but Peters said he did not remember "too much of everything[]" or whether what he had said was accurate. Peters agreed the investigator had read it to him and Peters had signed it, but he stated, "I didn't swear to nothing[]" and he did not know whether everything he had said was accurate.

Testimony of Troy Robinson

The State called Troy Robinson as a witness, who testified that he was an investigator for the Jefferson County District Attorney's Office and had previously been with the Port Arthur Police Department. Robinson testified that he had gone to the Travis County State Jail in Austin with another investigator a few weeks before trial to see Darren Peters. Robinson agreed that he wrote the information down that Peters provided to Robinson, he asked Peters to read and sign what he wrote, and Robinson notarized the document. Robinson identified State's Exhibit 128 as the statement he wrote based on what Peters told him and that Peters had reviewed, sworn to, and signed the statement.

Additional Testimony of Darren Peters

Darren Peters was called back to the stand to testify and again Peters said he did not remember telling Investigator Robinson that he had been to a nightclub in Port Arthur late on December 1st and early in the morning on December 2nd. Peters

also testified that he agreed he had seen Sonny Crowell that night, but Sonny was not at a club, and according to Peters, Investigator Robinson misunderstood what he had said. Peters said he did not remember telling Investigator Robinson that he saw Clark walk to his car, put on some shoes, and grab a gun. Peters also said he did not remember Clark pulling out a gun and pointing it at Crowell. Peters stated that he remembered that Robinson had asked him to sign some papers that he read, but he did not "remember all of that." State's Exhibit 128 was admitted into evidence. On cross-examination by the defense attorney, Peters testified that he did not go to the police because "I wasn't there. I didn't know." Peters also denied that he had seen Clark kill Sonny Crowell outside the nightclub on December 2nd and he said he did not see Clark at all that night. On redirect, Peters denied that he had told the prosecutor he was in fear for his family because he was incarcerated and could not protect them, and he denied telling the prosecutor he was in fear for his life.

State's Exhibit 128 was admitted into evidence. It is a five-page handwritten document, titled "Voluntary Statement[,]" signed by Darren Peters and notarized by Troy Robinson on each page. The statement reads as follows:

> On December 2nd 2018 at 1-2 am, I left my house and went to [the] Club [] around 11-12 pm on December 1st. I got to the club with [Suzie], I don't know her real name. When I got out of the car I'm walking in the parking lot that [Sonny Crowell] was shot. I notice [Sonny] was in the back parking lot. It's behind []Club. He is walking by himself. I noticed him so I called him over to see what was wrong with him. He told me nothing. He said a few more words to me but I don't recall what they were. I noticed a white Lexus pulled up. It was

10

Herb. He got out the car wearing slippers. He walked over to me[.] [Sonny] and [Dobbins] were out. [Sonny] was walking a circle. He told me that n***** there knows what's going on. [Sonny] was referring to Herb. Herb was like you talking to me? [Sonny] said I could be. [Dobbins] told them not to be tripping. Herb walked to his car put some shoes on and I think grabbed a gun. Herb came back and [Dobbins] said y'all going to fight don't be doing that. Herb was like f*** that n*****, [Sonny] responded f*** you. Herb pulled the gun out, [Dobbins] told him to put it up because he didn't want to get shot. [Dobbins] told Herb if you going to fight him just fight him. I said Herb you about to fight him. [Dobbins] told Herb to give him the gun. Herb gave the gun to [Dobbins] but kept saying he was going [to] kill a n*****, referring to [Sonny]. [Sonny] what's up with the killing. [Dobbins] told Herb you disrespected [Sonny] day before. They continued to talk back and forth. [Dobbins] gave the gun back to Herb and told him to go away. Herb grabbed the gun and started to walk and [Sonny] said something to Herb. Herb said say something again n*****. [Sonny] said something and Herb turned and started shooting. Herb shot [Sonny]. The gun was black and I've seen it in Herb's possession before. I fell next to [Sonny] we were both face down. Some girl said I'm a nurse and I told her not to touch [Sonny]. The police showed up. I didn't want [to] be involved because I was on paper. Guy I know as [Ashton] was standing next to me and I asked him to get me away from there. I got in [Ashton's] car, it's a Cadillac. [Ashton] told me he had it on video, the whole incident. [Ashton] told me he would talk to the police.

Testimony of Franklin

Franklin testified that at the time of trial, he was incarcerated in the Orange County jail and that he had numerous previous cases for theft. Franklin agreed that in January 2020, he informed the prosecutor through his own attorney that he knew something about Sonny Crowell's murder. Franklin also agreed that in exchange for talking with State investigators, the prosecutor agreed to get his bond lowered, but after he was released from jail, he went back to using and got arrested again on

another charge. Franklin testified that he was scared to be in jail after talking with the investigators because it is not a good thing to be known as a cooperative witness. According to Franklin, this was not the first time he had provided information about cases that he had learned about in jail, but that even though it put him in danger, he thought it was the right thing to do. Franklin agreed that he had no cases pending at the time of trial in Jefferson County.

Franklin testified that he had known Herbert Clark for three or four years, and he identified the defendant as Clark. Franklin testified that he and Clark shared the same dorm area in jail, he had heard Clark discussing Sonny Crowell, and he was bragging about "how it went down at the club and he got in an argument." According to Franklin, Clark said he did not want to fight, but he and Sonny got into an argument and Clark said he shot Sonny and "emptied the clip." Franklin stated that Clark was bragging about killing Sonny to make himself look tougher than the other inmates.

After the State rested, the defense moved for an instructed verdict, and the trial court denied the motion. The defense rested without calling witnesses or presenting evidence. The jury returned a guilty verdict, and after hearing evidence on punishment, the jury found the two enhancements true and assessed punishment at ninety-nine years of confinement and assessed a fine of $10,000.

## Issues

In his first issue on appeal, Clark argues that the evidence is insufficient to sustain his conviction because the witnesses at trial "failed to sufficiently identify [Clark] as the perpetrator of the offense[,]" failed to establish that he participated in the offense at all, and failed to establish that he was present at the scene of the shooting. Clark also argues that his conviction relies on speculative views of the evidence. In addition, Clark argues that the testimony of Franklin—a jailhouse informant—was not sufficiently corroborated.

Clark's remaining two issues concern the admission of evidence. He argues that the trial court erred by admitting Darren Peters's written statement. According to Clark, the State failed to make the proper predicate for admitting a prior inconsistent statement because the prosecutor simply read from parts of the written statement and did not ask Peters whether he admitted or denied the statement. Next, Clark argues that the trial court erred by allowing Detective Barboza to testify that he found Clark "in Dallas, Texas, at the jails there." According to Clark, Barboza's testimony was "absolutely irrelevant to the issues on trial[]" and "likely contributed to [Clark's] conviction because the obvious implication was that appellant had committed some extraneous bad acts warranting his incarceration." Clark also argues that the error could have been cured by instructing the jury to disregard the challenged testimony.

Admission of Evidence

We address Appellant's last two issues first. In issues two and three, Appellant complains about the admission of evidence. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). An evidentiary ruling will be upheld if it was correct on any theory of law applicable to the case. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). We review the trial court's ruling in light of what was before the trial court when it ruled. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

Darren Peters's Written Statement

Under Texas Rule of Evidence 613(a), to be admissible, a prior statement must be inconsistent with the testimony the witness gives at trial. Tex. R. Evid. 613(a); *Lopez v. State*, 86 S.W.3d 228, 230-31 (Tex. Crim. App. 2002). When examining a witness about the witness's prior inconsistent statement, a party must first tell the witness (1) the contents of the statement, (2) the time and place of the statement, and (3) the person to whom the witness made the statement. Tex. R. Evid. 613(a)(1). The proper predicate for impeachment by a prior inconsistent statement requires that the witness first be asked if he made the contradictory statement at a certain place and

time and to a certain person. *McGary v. State*, 750 S.W.2d 782, 786 (Tex. Crim. App. 1988). If the witness denies having made the inconsistent statement, the prior inconsistent statement becomes admissible. *Id.*

When Peters was called as a witness, his attorney told the court that Peters was "vehemently opposed to taking the stand[.]" Peters himself stated "I don't want to talk, and I don't want to testify." Peters then pleaded the Fifth in response to additional questioning on voir dire. With the jury present, Peters testified that he did not know where he was on December 2, 2018, and he did not remember talking with an investigator after the shooting. When the prosecutor showed Peters a written statement signed by Peters, Peters stated that he did not remember "too much of everything[]" or whether what he had said was accurate. Peters also testified that he had not sworn to anything or whether what he had said was accurate.

Officer Troy Robinson testified that he visited Peters in jail in Austin after the shooting, where Robinson wrote down the information Peters provided, he asked Peters to read and sign the statement, and Robinson notarized the statement, which was offered as State's Exhibit 128. When Peters returned to the witness stand, he testified that he did not remember telling Robinson he had been at a nightclub on December 2 and that Robinson had misunderstood what Peters had told him. Peters did not remember telling Robinson that he saw Clark that night, that he saw Clark

pulling out a gun and pointing it at Crowell, and he stated "I wasn't there. I didn't know[]" and he was not there that night.

The evidence reflects that Peters was informed of the contents of the statement in Exhibit 128, the time and place of the statement, and to whom he made the statement. Peters denied that he was present at the shooting or that he had seen Clark the night of the shooting. Peters testified that he did not remember anything about the shooting or giving the statement, he alleged that Robinson misunderstood what Peters had told him, and he denied swearing to anything. Peters's written statement styled as a "Voluntary Statement," is signed on each page by Peters and notarized on each page by Robinson. The statement was admitted into evidence and marked as Exhibit 128. The written statement reflects that Peters was present at the nightclub on December 2, 2018, he saw Clark and Crowell arguing, he saw Clark pull out a gun and heard Clark say he would kill Crowell, and he saw Clark shoot Crowell. Peters failed to "unequivocally admit" making the written statement. *See* Tex. R. Evid. 613(a)(4). The trial court did not abuse its discretion in admitting Exhibit 128 as a prior inconsistent statement because Peters was informed of the details about how the statement was made, and Peters denied making the statement or remembering anything about Crowell's shooting. Therefore, the statement would be admissible as nonhearsay as an inconsistent prior statement to impeach Peters. *See*

16

Tex. R. Evid. 613; *McGary*, 750 S.W.2d at 785-87. We overrule Clark's second issue.

Extraneous Offense Evidence

Clark also complains about the testimony from Barboza that he found Clark at a jail in Dallas. Rule 404(b) of the Texas Rules of Evidence provides in pertinent part as follows:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) Permitted Uses[.] This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

Tex. R. Evid. 404(b). The list of enumerated purposes for which extraneous offense evidence may be admissible under Rule 404(b) is neither exclusive nor exhaustive. *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g). Extraneous offense evidence may be admissible if it has relevance apart from its tendency to prove a person's character to show that he acted in conformity therewith. *Id.* at 387. Evidence of flight reflects on a defendant's consciousness of guilt of the crime charged. *See Yost v. State*, 222 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) (en banc)).

In this case, Detective Barboza testified that, while investigating the Sonny Crowell shooting, he located Clark "in Dallas, Texas, at the jails there." Barboza

also testified that a woman named Elynne told him she gave Clark a ride to Dallas early in the morning after the shooting happened. Elynne testified at trial that Clark had come to her apartment in the middle of the night in December 2018, Clark wanted her to take him to Dallas, and she took him to Dallas. When Barboza testified he found Clark at a jail in Dallas, the defense objected that this testimony concerned an extraneous offense that was subject to a motion in limine. The trial court overruled the objection and instructed that the prosecutor must not ask any questions about why Clark had been arrested in Dallas. Appellant has not identified any portion of the record that shows the testimony was admitted or used to prove his character and to show that he acted in conformity therewith.

Even assuming that this testimony was admitted in error, we will not overturn a judgment for the erroneous admission of evidence unless the appellant shows that the evidence affected his substantial rights. *See* Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, the appellate court "has fair assurance that the error did not influence the jury[] or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). The record does not reflect that Clark requested a jury instruction to disregard such testimony or an instruction in the charge on the limits of extraneous offense evidence, and on appeal, Clark concedes that an instruction to

18

disregard would have cured the complained-of error. We conclude that the trial court did not err in admitting this evidence, and we overrule Appellant's third issue.

Sufficiency of the Evidence

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Metcalf v. State*, 597 S.W.3d 847, 865 (Tex. Crim. App. 2020) (citing *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995)). The appellate court does not reweigh the evidence or determine the credibility of the

evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

A person commits murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). "Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death." *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. Tex. Penal Code Ann. § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

20

In a homicide case, the defendant's state of mind is a question of fact for the jury to determine, and the jury may infer intent "from any facts in evidence which it determines proves the existence of such intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967)). "It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (internal citations omitted). Intent to murder can be inferred from circumstantial evidence, such as a defendant's acts, words, and the extent of the victim's injuries. *See Ex parte Weinstein*, 421 S.W.3d 656, 668-69 (Tex. Crim. App. 2014). Evidence of flight reflects on a defendant's consciousness of guilt of the crime charged. *See Yost*, 222 S.W.3d at 875 (citing *Bigby*, 892 S.W.2d at 884).

On appeal Clark argues that the evidence was insufficient because none of the eyewitnesses that testified at trial identified him at trial as the shooter, and he claims that any statement made by the eyewitnesses prior to trial that identified Clark as the shooter were unsubstantiated and contrary to what the same witnesses said at trial. "Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *See Ingerson v. State*, 559 S.W.3d 501,

21

509 (Tex. Crim. App. 2018) (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). The identity of the defendant as the perpetrator of the alleged crime may be proven by inferences, and when there is no direct evidence of the perpetrator's identity elicited from trial witnesses, no formalized procedure is required for the State to prove the identity of the defendant as the perpetrator of the crime. *Clark v. State*, 47 S.W.3d 211, 214 (Tex. App.—Beaumont 2001, no pet.). Even though an eyewitness of the shooting recanted or changed his statements about seeing Clark shoot the victim, that does not mean the evidence presented to the jury was insufficient. The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Id*. The jury may choose to believe some testimony and disbelieve other testimony. *Id*.

Sonny's daughter Rachel testified that, about a week before Sonny was killed, Clark approached her and a friend outside the nightclub, Clark became angry, he pulled out a gun, and told Rachel to "call [her] daddy[.]" Ashton testified that he heard gunshots and saw a shooting at the same nightclub in the early morning of December 2, 2018. Ashton testified that he saw two men arguing, the big guy was Ty V or Sonny, and he was shot by the other man whom Ashton described as the "little guy." Ashton agreed that he told the police that he thought the "little guy" was

22

"Little Herb," but he was not one hundred percent sure. Ashton said he heard eight or nine shots that night, and Sonny was shot. According to Ashton, Darren Peters was at the nightclub that night, too. Ashton was a reluctant witness and said he did not want to testify at trial, and at trial he was not able to identify the defendant Clark as the shooter. Darren Peters was another reluctant witness at trial. But, Peters had previously signed a written statement which summarized information that Peters gave to Officer Robinson. That written statement was admitted into evidence, and in it Peters stated he had seen Herb and Crowell arguing in the parking lot that night, Herb pulled out a gun, and Herb shot Crowell. Peters testified differently at trial, and Peters claimed at trial he did not see Clark shoot Sonny that night and he could not identify Clark. Elynne testified that Clark came to her home early in the morning on December 2, 2018, he asked her to take him to Dallas, and Elynne drove Clark to Dallas. Investigator Barboza testified that he found Clark in Dallas. An inmate who had been in jail with Clark, Franklin, testified that he had heard Clark in jail bragging about how Clark had gotten into a fight with Sonny Crowell, that he shot Sonny, and Clark said he had "emptied the clip." Franklin's testimony was corroborated by Darren Peters's written statement and testimony from other witnesses about the number of rounds fired and bullets fired into Sonny. For example, Marie Kirkland testified that eight 9mm shell casings were identified where the shooting occurred, and Brandy Henley testified that the fired shell casings that were retrieved were all

23

fired from the same firearm. Dr. Rivers testified that Crowell died from multiple gunshot wounds, Crowell had nine gunshot wounds, and two of the wounds would have been very quickly fatal.

Having viewed the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found beyond a reasonable doubt that Clark was the person who caused Sonny's death. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial, and we presume that the jury resolved all conflicts in the testimony, weighed the evidence, and drew reasonable inferences from the evidence in a manner that supports the verdict. *See id.*; *Hooper*, 214 S.W.3d at 13. The jury could have reasonably inferred from the direct and circumstantial evidence presented that Clark was the shooter and caused Sonny's death. "This was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012). We overrule Clark's first issue. We conclude that the cumulative force of the evidence is sufficient to support Clark's conviction for murder. *See Jackson*, 443 U.S. at 319; *Metcalf*, 597 S.W.3d at 865; *Temple*, 390 S.W.3d at 359; *Hooper*, 214 S.W.3d at 13.

Having overruled all of Clark's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on August 3, 2022
Opinion Delivered August 17, 2022
Do Not Publish

Before Golemon, C.J., Kreger and Johnson, JJ.

25